COLUMBIA WIRE CO. v. FREEMAN WIRE CO. et al.

(Circuit Court, E. D. Missouri, E. D.    December 23, 1895.)

No. 3,901.

1. PATENTS—PRELIMINARY INJUNCTION.
A preliminary injunction should be granted, in the absence of affirmative defenses, where infringement is clear, the monopoly secured by the patent has been generally acquiesced in by all manufacturers and dealers, and where it appears that complainant's established business would be seriously interfered with by denying the injunction, while defendants have not yet begun to manufacture with the infringing machines, and would not be seriously affected in their pursuit by the injunction.

2. MUTUALITY OF CONTRACTS.
It seems that an agreement, by the owner of a patent for certain machines, to furnish to another "such a number of machines as they desire for their own use at present or hereafter," is void for want of mutuality.

3. CONSTRUCTION OF CONTRACTS.
Where the owner of a patent for certain barbed-wire machines contracted to furnish to a company, which at the time was engaged in equipping a shop for the manufacture of barb wire, "such a number of machines as they desire for their own use at present or hereafter," held, that the natural construction of the contract would limit the obligation to the furnishing of the number of machines required for equipping that shop.

4. TRANSFER AND ABANDONMENT OF CONTRACTS.
A corporation manufacturing barbed wire obtained from the owner of a patent covering barbed-wire machines an agreement to furnish it such a number of the machines "as they desire for their own use at present or hereafter." Thereafter the corporation sold and transferred all its assets and property to a new company, controlled and managed by practically the same owners. The contract was not included in the inventory, but its possession passed to the new company, and was represented as belonging to it, by its officers, in transactions with third parties. The original corporation discontinued business, having no place of business, no assets, money, or property, and continued in this state for over six years, when it was revived, and claimed a right, under the contract, to procure as many machines as it desired, and, in default thereof, to make them for itself. Held, that the contract had either passed to the successors of the old company or had been effectually abandoned.

5. MONOPOLIES—PATENTS—STATE ANTI-TRUST LAWS.
A corporation organized for the purpose of acquiring patents and granting licenses thereunder, and which has acquired many, if not all, of the valuable patents covering machines relating to a certain art, is not subject to the anti-trust laws of Illinois; for to subject patents to the operation of state laws of this description would be inconsistent with the rights acquired under the patent laws. Harrow Co. v. Quick, 67 Fed. 131, disapproved. Edison Electric Light Co. v. Sawyer-Man Electric Co., 3 C. C. A. 605, 53 Fed. 592; Strait v. Harrow Co., 51 Fed. 819; and Soda-Fountain Co. v. Green, 69 Fed. 333,—followed.

6. JURISDICTION OF FEDERAL COURTS—STATE LAWS RESPECTING FOREIGN CORPORATIONS.
Failure of a foreign corporation to file a copy of its charter with the officers of a state, as required by the state laws, does not affect its right to sue in the federal courts in the state, whatever effect the omission may have, by the state decisions, upon the right to sue in the state courts.

This was a suit in equity by the Columbia Wire Company against the Freeman Wire Company and others for alleged infringement of a patent relating to barbed-wire machines.

John M. Holmes, E. H. Gary, and John R. Bennett, for complainant.
R. H. Parkinson and W. B. Homer, for defendants.

ADAMS, District Judge.   This is an application for a preliminary injunction to restrain the defendants from making or using certain machines for the manufacture of barbed wire in infringement of complainant's patent, No. 365,723.   While I have considered all the questions presented, so far as seems necessary for the purposes of this application, I do not consider it wise to do more now than merely state my conclusions on most of the many phases of the case.   To entitle a complainant to a preliminary injunction in a suit for infringement of a patent, he should satisfy the court: First, of the validity of his patent.   This can be done by producing a favorable adjudication thereon by some court of concurrent jurisdiction, or by satisfactory proof that his monopoly under the patent has been recognized and acquiesced in by the public for such reasonable length of time as to inspire a strong conviction that its validity is not questioned.   Second, of clear infringement by the defendants.   If there is any substantial doubt on either of these propositions, no preliminary injunction ought, ordinarily, to be awarded.   In passing on the application for a preliminary injunction in such case the court should also consider the effect on the business and interests of the parties by withholding or granting the relief prayed for, and any and all other circumstances affecting the equities of the situation.

Applying these principles to the case at bar, I am brought to the following conclusions:

First. There has been no adjudication of the validity of complainant's patent by any court of concurrent jurisdiction, but there has been such acquiescence in the monopoly of the complainant, under the patent, by all manufacturers and dealers in barbed wire and machines for its manufacture, as, added to the prima facie evidence arising from the grant, sufficiently establishes its validity for the purposes of this application.

Second. There is almost conclusive evidence of infringement by the defendants.   The machines manufactured by defendants are, according to the weight of evidence, substantially a counterfeit of the machines manufactured by and under complainant's patent.

Third. The evidence shows that by denying the application the complainant's business, which is already large and important, would be very seriously interfered with; and the defendants, who have not yet begun the manufacture of barbed wire with the machines which are the subject-matter of this controversy, would not be seriously affected in their present business by awarding the injunctive order.

Fourth. The evidence discloses a secrecy and stealth in the construction of the machines by the defendants which seem inconsistent with the consciousness on their part of entire rectitude in so doing. The evidence also shows that the defendants have no financial responsibility.

Unless, therefore, there are some affirmative considerations presented by the defendants which confer upon them a right to use the de-

vice of complainant's patent, or destroy the complainant's equity to maintain this suit, a preliminary injunction ought to be awarded.

## Affirmative Defenses.

The main affirmative defense to this application rests upon a supposed right or license existing in the defendant Freeman Wire Company to have or manufacture the machines in question under the provisions of a contract executed by the Bates Machine Company, of date August 19, 1888, whereby it is claimed the last-named company, then or soon after the owners of the patent in controversy, agreed to "furnish to the Freeman Wire Company," the complainant herein, "such a number of machines as they desire for their own use at present or hereafter." It is very doubtful if this contract has any legal validity. On its face, no duty or obligation is cast upon the Freeman Wire Company to take any number of machines, or to do anything except to pay for such as they might desire. It seems to me to be void for want of mutuality. See Lawson, Cont. § 97, and cases cited. If there were no other considerations, I believe this view of the contract ought to dispose of it as a justification for defendants; but there are other views to be taken of it which bring us to the same conclusion. The defendant company was, at the time of the execution of this contract, about to inaugurate a business of manufacturing barbed wire in a shop then being equipped by it in East St. Louis, Ill., and needed machines to equip this shop for business. It was under such circumstances that the contract was executed. Considering these circumstances, and the phraseology of the contract itself, which contemplates furnishing such machines as the defendant desires (that is, then desires), it seems to me that the natural construction to be given the contract would limit the obligation of the Bates Company to furnish such machines as the defendant the Freeman Wire Company required for the purpose of equipping that shop. The defendants claim that under this contract the Freeman Wire Company could, at any time or times after its execution, and can now, demand from the plaintiff, who is the successor to the Bates Company in the ownership of the patent under which said machines were to be manufactured, any number of its machines, for use anywhere; and, if they are not supplied, that it can proceed to manufacture the same. This, in my opinion, is an unreasonable interpretation of the contract. It would be, in effect, a conveyance of the entire monopoly of the patent to the Freeman Wire Company. But there are still other reasons for not justifying the defendants in their present claims under this contract. In June, 1889, the defendant Freeman Wire Company sold and transferred to a newly-organized company by the name of the Freeman Wire & Iron Company all its assets and property, including, presumably, this contract; and discontinued business. It is true that the physical properties sold were inventoried at the time, and that the inventory did not specify this contract. The new company went on doing business at the old stand of its predecessor, and was owned, controlled, and managed practically by the same owners and officers as its predecessor had

been. This new company became a licensee of the complainant, and recognized its legal ownership of the patent in controversy, and in terms admitted the novelty, utility, and validity of the same. Afterwards, in February, 1895, the Freeman Wire & Iron Company sold and transferred all its assets and property to the Consolidated Steel & Iron Company, and discontinued business. At that time the contract of August 19, 1888, was in the possession of the officers of the Freeman Wire & Iron Company, and was represented by them to be the property of the last-named company, and was used as a special inducement to bring about the purchase by the Consolidated Steel & Iron Company. The purchase was made by it, and this contract was delivered to the purchaser; and I do not doubt from the evidence that the delivery was intended by the parties to be a sufficient transfer of whatever valuable rights, if any, the said Freeman Wire & Iron Company had in said contract. A delivery of a contract with such intent is as effective to transfer rights thereunder as a formal assignment would be. The fact that the last-named company, by its officers, had it in its possession, that it was the successor to the original Freeman Wire Company, under the circumstances above detailed, creates a strong presumption that it became the owner, by delivery of the instrument, at the time the other assets were turned over to it, of any and all possible rights which the Freeman Wire Company ever had in and to the same.

Returning now to the Freeman Wire Company: After it transferred its assets and property to the Freeman Wire & Iron Company, it ceased to do business. It had no place of business. It had no assets, money, or property to do business with. It continued in this comatose state for about seven years, namely, until July, 1895, when, probably for the sole purpose of endeavoring to assert rights under this old contract, it took the legal steps required by the laws of the state of Missouri, under which it was incorporated, to reduce its capital from $60,000, as originally capitalized, to the nominal sum of $2,500, and after this was done it proceeded in a secret way to manufacture machines under plaintiff's patent, claiming the right so to do under the old contract of August 19, 1888. In my opinion, if this contract was not limited, with respect to the machines which defendants might demand of the Bates Machine Company or its successors, to the then known necessities of the parties, it was either transferred to the successors of the defendants, and thus ceased to be available as a protection now to the defendants, or was entirely abandoned and for naught held at or before the time of the first transfer to the Freeman Wire & Iron Company, and is now no justification whatever for the defendants' present claims.

The defendants further claim that under the bill of complaint the plaintiff is entitled to no preliminary injunction against the defendants, because no specific charge is made against them; that, on the contrary, the wrong and injury complained of are alleged to be done and threatened by the American Wire-Nail Company, a corporation doing business at Anderson, in the state of Indiana. While the bill is somewhat confused, and might be made more definite in this respect, it sufficiently appears, I think, that the defendants in this case

are charged at least with being the instruments in the hands of the American Wire-Nail Company in the infringement complained of. They are, by the averments of the bill, joint trespassers or tort feasors with that company, and cannot complain that their associates in wrong are not joined with them.

Defendants next rely upon the facts set forth in a special plea filed herein. First, upon the provisions of the anti-trust laws of the state of Illinois, and allege that the complainant exists in violation of such laws, and is a party to an unlawful trust or agreement, within the meaning of such laws; and therefore ought not, in equity and good conscience, to be permitted to prosecute this suit. The proof on this plea is substantially this: The complainant is a corporation organized under the laws of the state of Illinois for the purpose of acquiring patents and granting licenses thereunder. It has become possessed of many, if not all, of the valuable patents for the manufacture of barbed wire and the machines for so doing, and has granted a large number of licenses to persons and corporations under its said patents. The evidence further shows that it has not bound its licensees to any prices, or in any manner limited or restricted their sales or output. The defendants rely, in support of their plea in this regard, upon the case of Harrow Co. v. Quick, 67 Fed. 131. In that case it appears that the complainant was organized for the purpose of acquiring the ownership of all patents held by different corporations and business firms in the United States which are engaged in the manufacture or sale of spring-tooth harrows, and to grant licenses to such corporations and firms to use the patents so acquired, on the payment by them of certain fixed royalties, and to fix and regulate the price at which such harrows shall be sold by its licensees. In the first place, it should be noticed that the facts in that case in regard to the purposes of the organization are different from the facts in the case at bar. In the case at bar it appears, without contradiction, that the complainant's licensees are in no manner restricted or controlled in respect to the prices they shall ask or get for wire manufactured under their licenses. In other words, there appears to be, so far as the complainant's licensees are concerned, unrestricted competition in the sale of their products. The above-mentioned case cannot, therefore, be treated as authority in determining the issue presented in this case on such a different state of facts. I would quite agree with the learned judge who wrote that opinion that the correctness of his conclusion, even in that case, was not free from doubt. I prefer, therefore, not to put my decision of this question on so narrow a ground as to recognize the authority of that case, and differentiate this from it. The entire theory and purpose of our patent laws is to create a limited monopoly. In consideration that a patentee will give his invention to the public, with full drawings and specifications, so as to enable the public to freely use it at the expiration of 17 years, a grant is made to him of an exclusive right to the monopoly of the patented article or device during that time. The rights so acquired by the patentee under a grant from the United States are entirely inconsistent with the patentee's being made subject to the provisions of the anti-trust laws of the several states. Under his grant he has

been given, and for the consideration already alluded to is entitled to maintain, a monopoly in the disposition or use of the patented article or device. This I understand to be the rule announced by the circuit court of appeals for the Second circuit in the case of Edison Electric Light Co. v. Sawyer-Man Electric Co., 3 C. C. A. 605, 53 Fed. 592. It has also been announced in circuit courts in the following cases: Strait v. Harrow Co., 51 Fed. 819; Soda-Fountain Co. v. Green, 69 Fed. 333.

The defendants again resist this application on the ground that the complainant has not complied with the foreign corporation law of the state of Missouri, by filing a copy of its charter, etc., with the secretary of state, before bringing this suit; and that, therefore, in accordance with the provisions of that law, it cannot maintain this action. It is sufficient to say, with regard to this contention, that whatever construction may be given to this law by the state courts in respect to suits coming within their exclusive jurisdiction, it cannot be made applicable to suits instituted in the federal courts without denying the jurisdiction conferred by congress upon such courts. Accordingly, this ground of opposition to the injunction cannot be sustained.

It results from the foregoing views, that the complainant's motion for a preliminary injunction should be sustained. By reason, however, of the fact that this application is heard on ex parte affidavits, and as the facts may appear differently when made subject to the scrutiny of cross-examination on final hearing, I think the complainant ought to be required to give a bond in the usual form, with satisfactory sureties, to secure the defendants from loss or damage in the event of a final dissolution of the injunction. This bond will be fixed in the sum of $10,000. Counsel may prepare the form of restraining order and bond, and submit them to the court.