UNITED STATES CONSOLIDATED SEEDED RAISIN CO. v. GRIFFIN & SKELLEY CO.

(Circuit Court of Appeals, Ninth Circuit.   November 9, 1903.)

No. 929.

1. MONOPOLIES—LEGALITY OF CONTRACTS—LICENSES UNDER PATENTS.

Contracts by which a number of patents covering similar inventions are conveyed by the several owners to one of the parties, which grants licenses under all to the others, are not void as against public policy, or as in violation of the Sherman anti-trust law, because of provisions intended to protect and keep up the patent monopoly by requiring the licensor to prosecute all infringers, limiting the licenses to be granted to such licensees as shall be agreed on, and imposing conditions on each licensee as to the use and ownership of the patented machines, and prohibiting him from using any others.

2. PATENTS—RIGHTS OF PATENTEE—EFFECT OF STATE LAWS.

Rights acquired under the patent laws of the United States cannot be affected by a state statute.

3. CONTRACTS—EFFECT OF ILLEGAL PROVISIONS—DIVISIBILITY.

Stipulations in a contract which are invalid as in restraint of trade, if capable of being construed divisibly, do not affect the validity of other provisions.

4. SAME—VALIDITY—WHEN QUESTION FOR JURY.

Conceding that a contract legal in its terms and in its consideration may be rendered illegal as against public policy by reason of the intention of the parties to so use it as to commit civil injury to third persons, where the evidence as to such intention is conflicting the contract cannot be declared illegal by the court as matter of law.

In Error to the Circuit Court of the United States for the Northern District of California.

The plaintiff in error is a corporation created under the laws of New York. Prior to June 26, 1900, it was the owner of two certain patents for machines for seeding and processing raisins.   Other persons and corporations at Fresno, Cal., engaged in the raisin-seeding business, owned certain other patents.   Litigation had arisen between the owners of these patents.   To end this litigation, and to avoid it in the future, an agreement was made on June 26, 1900, between the plaintiff in error, as the party of the first part, and the Forsyth Raisin Process Company, the Forsyth Seeded Raisin Company, the Griffin & Skelley Company, the California Seeding Machine Company, William M. Griffin, Thomas E. Langley, Cary S. Cox, and Lee L. Gray, as parties of the second part.   The agreement recites that the party of the first part is the owner of patents numbered 543,833 and 543,834, and that the parties of the second part own patents numbered 611,782, 641,938, 641,939, 614,178, 592,131, 602,698, 619,698, and 679,223, and that it is deemed expedient and for the interest of all parties that all of said letters patent be combined for mutual protection and assistance.   It thereupon provides, in substance, that the parties of the second part shall assign their various patents to the party of the first part, and that the latter shall use every reasonable effort to defend and protect the several inventions and letters patent in the interest of all, and that it shall grant licenses under said patents, institute and defend suits to protect said inventions and letters patent.   The agreement provides further that the royalties which shall be received on license contracts shall, after the deduction of expenses and other charges, as provided for in the agreement, be paid 40 per cent. to the plaintiff in error on

¶ 1. Validity of monopolistic contracts as affected by public policy, see note to Cravens v. Carter-Crume Co., 34 C. C. A. 486.

account of its patents, 30 per cent. to the Forsyth Raisin Process Company on account of its patent, 20 per cent. to the present owners of letters patent 619,698, 6 per cent. to Thomas E. Langley and C. S. Cox, and 4 per cent. to the California Seeding Machine Company.  The agreement provides for an appointment of an advisory committee of four members, two to be designated by the party of the first part, and two by the parties of the second part; said committee to have authority to determine to whom licenses shall be granted under the letters patent, the terms and conditions thereof; and it gives the committee power to employ a financial agent, whose duty it shall be to collect and distribute the royalties under such licenses.  The agreement makes further provision for the payment of salaries of officers, taxes, and other expenses, makes reference to a suit then pending in the United States Circuit Court for the Northern District of California by the Forsyth Raisin Process Company against A. L. Hobbs & Co. on letters patent 611,782, and provides that the same shall be prosecuted without delay at the expense of the plaintiff therein.  The agreement proceeds to provide that, in case any of the said mentioned letters patent shall be judicially determined to be invalid by a court of last resort, then the share of royalties in the agreement apportioned to and on account of such letters patent shall thereafter not be paid.

The licenses issued under this agreement were all in the one form.  They recited that the plaintiff in error, the licensor, is the sole owner of the letters patent referred to in the agreement; and, first, that it grants to the licensee the right to use machines and processes embodied in and covered by said letters patent throughout the United States for the life of said patents; second, that the party of the second part shall pay therefor as license fee one-eighth of one cent for each pound of raisins seeded or processed under said letters patent during the years 1900 and 1901, and thereafter one-fourth of a cent per pound; third, that the licensor shall from time to time lease to the licensee raisin-seeding machines, processes, appliances, fittings, etc., as the same may be required, upon payment of the actual cost of the same, title to such machines, however, to remain in the licensor; fourth, that the licensee "shall use every reasonable endeavor to secure and promote the business of raisin-seeding under this contract, shall neither sublet any of said machines, nor allow any parties, except its own employés, to have possession or control of or to use said machines; shall not use any other raisin-seeding machines during the life of this contract than those furnished by the first party, or with their consent; and shall not buy, sell, nor deal in raisins seeded or treated by any other machines or processes than those of the first party."  The fifth provision requires the licensee to keep suitable books of account, open to the inspection of the licensor.  The sixth prohibits the licensor from licensing any other party under said letters patent for less royalty or compensation than one-half a cent per pound for raisins seeded under or processed under the said patents, except with the consent of four of certain named of the licensees.  The license contract contains the provision that the licensor shall vigorously prosecute infringers of said letters patent, so as to prevent, as far as possible, all unlawful interference with the business and rights of the licensee under and by virtue of the contract.

The plaintiff in error brought an action at law against the defendant in error, alleging that on June 27, 1900, one of the above-mentioned contracts of license was entered into and executed by the said parties; that thereafter, during the years 1900 and 1901, the defendant in error processed about 12,000,000 pounds of raisins, the license fees and rentals for the same, as provided for in said contract, being the sum of $15,000; that no part of said sum has been paid except $3,759.42, and that the remainder, $11,240.58, is due and unpaid.  The plaintiff in error, as a second cause of action, alleged that after March 15, 1901, the defendant in error willfully and maliciously, and for the purpose and intent of damaging and injuring the plaintiff in error, failed, refused, and neglected to use every or any reasonable endeavor to secure or promote the business of raisin-seeding under said contract, and did sublet and transfer certain and sundry raisin-seeding and processing machines which it owned and was operating prior to the execution of the contract of June 27, 1900, to other parties, who were not its own employés, and did authorize, permit, and allow such other parties to use the same, and did

buy, sell, and deal in raisins seeded and treated by other machines and processes than those of the plaintiff in error, to its injury in the sum of $10,000. The defendant in error made its answer to this complaint by denying that it was indebted to the plaintiff in error for license fees or rentals or for damages, and alleged as matters of defense, in substance, that on February 25, 1901, the defendant in error rescinded its license contract with the plaintiff in error, and gave to it written notice thereof; and as reasons for such rescission alleged that prior to the execution of said contract it was understood and agreed between the defendant in error and the plaintiff in error that a similar contract should be entered into by the plaintiff in error with the Griffin & Skelley Company, Forsyth Seeded Raisin Company, Fresno Home Packing Company, Porter Bros. Company, Fruit Cleaning Company, Golden West Packing Company, and the Co-operative Packers' Association; that by reason of said representation the defendant in error was induced to sign said contract, and otherwise would not have signed the same, but that the plaintiff in error has wholly failed to obtain a contract with the Co-operative Packers' Association. The defendant in error, in its answer, further alleged that at the time of the contract of June 26, 1900, the plaintiff in error represented that it was the owner of patents numbered 631,938 and 631,939; that the defendant in error relied on such representation, but that thereafter it learned that the plaintiff in error did not own the said letters patent, or either of them, and on February 25, 1901, it learned that said representations were false, and that the plaintiff in error had not and would not acquire title to the said letters patent, or either of them. The answer further alleged, as ground for rescinding the contract of license, that the plaintiff in error willfully and negligently failed and refused vigorously to prosecute infringers of the letters patent enumerated in the contract of June 26, 1900, and that it did not prevent as far as possible all or any unlawful interference with the business and rights of the defendant in error under said agreement; that by reason of such failure the general public disregarded said letters patent, and without the consent of the plaintiff in error, in opposition to its rights and to the rights of the defendant in error, openly, continuously, and generally used the devices and processes covered by said letters patent without paying license fees or royalty to the plaintiff in error; that a material and chief consideration moving to said defendant in error should protect the defendant in error in its business and rights under said contract, and prevent unlawful interference with such business and rights by persons engaged in such business in competition with the defendant in error; that such consideration has utterly failed; that the plaintiff in error has failed to protect the business and rights of the defendant in error, and has permitted general, continuous, and open use of the patented devices and processes referred to in said contract. Upon these issues the cause was tried before the court and a jury. At the conclusion of the evidence and the arguments of counsel, the court submitted to the jury the decision of the various questions raised upon the issues so presented. After the jury had retired to consider of their verdict, the court recalled them, and gave them a peremptory instruction to find for the defendant in error. In so instructing them the court said: "There are three propositions only in the case, and I think upon either one of them you should find for the defendant. I think the contract is void, first, because it is contrary to a provision of your statute, section 1673, as explained to you. I think it is void because it is in contravention of public policy, because, if carried out to the full extent that it was intended to be, it would have amounted to a monopoly of the business. In the next place, I think it is void because it provided for certain litigation, and I am inclined to think the testimony justifies the belief that that litigation must be pressed, regardless of the rights of other parties, and with a view of oppressing them and driving them out of business. Courts cannot sustain any such contracts."

The evidence on which the court held that the combination contemplated oppressive litigation was the testimony of William Forsyth and A. Gartenlaub, Forsyth, who was president of three of the corporations who were parties of the second part to the contract, and attorney in fact for the remainder of the parties of the second part in signing the contract of June 26, 1900, testified

that in the negotiations leading up to the contract the plaintiff in error was represented by its secretary, James Williamson, and its treasurer, C. F. Allen. The court drew from the witness the following testimony: "The Court: I do not know whether I got a wrong impression or not, but I want to know what the fact was. What was the understanding as to the prosecution of the holders of other patents? Was it the design of the organization, or the understanding among you, that these prosecutions should be urged for the purpose of wearing them out, or because they were infringers? A. Other patents, you mean; people using the same machines? Q. No, sir; I mean those that were engaged in the business; these outside parties that you expected to close out. A. Both for the purpose of wearing them out and to stop them using the machines. Q. I inferred that, and I wanted to know whether that was a part of the combination. That was a part of this combination? A. Yes, sir." The witness proceeded to refer to litigation pending at that time for infringements of patents held by the plaintiff in error, after which he gave the following testimony: "Q. What was said, if anything, in regard to closing up any other concern, and how did they propose to close them up? A. By bringing suits against them. Q. Suits for what? A. For infringing of patents." A. Gartenlaub, who was in the seeded raisin business at Fresno, and who refused to take a license from the plaintiff in error, testified to a conversation which he had with James Williamson, as follows: "Q. When he said he was going to sue people who did not take out a license, did he give you to understand that he was going to sue for an infringement of some of these patents? A. He said he was going to close them up; he would worry them out of business. Q. Did you not ask him how he was going to close them up? A. I did not. He told me how. He explained to me. Q. Did he not say he was going to bring suits on these patents for infringements? A. He said he owned all the patents, and, the patent litigation being so expensive that you could not defend a suit for less than $5,000 or $10,000, that, if he kept on filing five or six suits, he would worry a man out so that he would either close up or take out a license. Q. The suits were for infringement of the patents? A. He did not explain to me how he was going to file his suits." As opposed to this testimony were the depositions of Williamson and Allen, taken in New York before the trial; taken, it is true, on the issues raised on the answer, yet referring in general terms to the negotiations which led up to the contract. Williamson, being asked whether anything was said as to the purpose or objects of the combination, answered: "Nothing further than that the United States Consolidated Seeded Raisin Company was to become the owner of the patents, and, as the owner of the patents, license certain people." Charles F. Allen was asked the following questions: "Q. State whether or not all the representations made by the plaintiff to the defendant—that is to say, such representations as were made to induce them to sign the contract—are contained in the license contract itself which was issued to them. A. Yes, sir. * * * Q. Was it not one of the purposes of the combination that you should get a sufficient number of patents to control the raisin-seeding art? A. No, sir. Q. What was the object in getting together this considerable number of patents? A. Because those who gave their patents did it to stop litigation that we had brought against them." Alfred Nichols, the president of the plaintiff in error, also deposed "that no representations or statements were made by the plaintiff to induce defendant to enter into this license contract other than such statements and representations and promises and agreements as were contained in the written document itself." As tending to contradict the testimony of Forsyth and Gartenlaub, other witnesses testified as to the representations made by the plaintiff in error to induce them to join the combination. T. E. Langley testified that Williamson said that they would prevent others who did not take out licenses from operating by bringing suits against them. "Q. What were they to sue them for? What was to be the basis of the suits? A. Infringement of the patents." A. L. Hobbs, who was asked to join the combination, testified that in the representations made to him it was not said that the plaintiff in error would bring suits for anything except what they claimed was an infringement. John Bonner, who declined to join the combination, gave similar testimony.

John H. Miller, for plaintiff in error.

Platt & Bayne and H. H. Welsh, for defendants in error.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

GILBERT, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The Circuit Court instructed the jury to return a verdict for the defendant in error, holding the contract void on three grounds: First, that it was contrary to public policy, in that it tends to create a monopoly; second, that it is prohibited by the provisions of section 1673 of the Civil Code of the State of California; and, third, that it was contrary to public policy, for the reason that it provided for oppressive litigation. That such a contract is not void as against public policy, in that it tends to create a monopoly, has been decided by the Supreme Court in the case of Bement v. National Harrow Co., 186 U. S. 70, 22 Sup. Ct. 747, 46 L. Ed. 1058. In that case a contract had been entered into between the National Harrow Company and various other corporations and firms engaged in manufacturing float spring tooth harrows, their frames and attachments, under various patents, 85 in number, which were assigned to the National Harrow Company. That corporation then entered into contracts with the other parties to the agreement, and gave to each a license very similar to the license in question in the present suit. The license provided that the licensee should pay a fixed royalty, should make verified reports of its business, and that it should not sell its products manufactured under the license at a lower price or on more favorable terms of payment than was set forth in a schedule which was made a part of the license, except that the licensor reserved the right to reduce the selling price and to reduce the royalty. The licensee agreed that it would not, during the continuance of the license, directly or indirectly engage in the manufacture or sale of any other float spring tooth harrows, etc., than those which it was licensed to manufacture and make under the terms of the license, except such as it might manufacture and furnish another licensee of the National Harrow Company, and then only such constructions thereof as such other licensee should be licensed by the National Harrow Company to manufacture and sell, except such other style and construction as it might be licensed to manufacture and sell by the National Harrow Company. Provision was made for the payment of fixed liquidated damages for breach of certain of the terms of the license, and the licensee agreed not to, directly or indirectly, in any way contest the validity of any patent under which it was licensed to manufacture, or which it might manufacture for another licensee; and it agreed also not to alter or change the construction of the float spring tooth harrow, the frames, etc., which it was authorized to manufacture under the license and under the patents. The licensor covenanted not to grant licenses to any other person or any right to manufacture articles of the peculiar style and construction, or embodying the peculiar features thereof, used by the licensee. It was agreed that the license should continue during

the life of the patent or patents applicable thereto, and during the term of any reissue thereof. There were other provisions of the contract not necessary here to be considered. The licensee having violated the contract, suit was brought to recover damages and to restrain further breaches. The licensee, in defense thereof, answered that the license grew out of a combination of the National Harrow Company and other manufacturers and dealers, which amounted to a combination to regulate the manufacture and provide for the sale of float spring tooth harrows at fixed prices throughout the United States, and that said combination was void, as in restraint of trade, and a monopoly prohibited by the Sherman act. In the opinion of the court Mr. Justice Peckham said of the patent laws of the United States:

"The very object of these laws is monopoly, and the rule is, with few exceptions, that any conditions which are not in their very nature illegal with regard to this kind of property, imposed by the patentee and agreed to by the licensee for the right to manufacture or use or sell the article, will be upheld by the courts. The fact that the conditions in the contracts keep up the monopoly or fix prices does not render them illegal."

Concerning the application of the Sherman act to the contract in question, the court said:

"But that statute clearly does not refer to that kind of a restraint of interstate commerce which may arise from reasonable and legal conditions imposed upon the assignee or licensee of a patent by the owner thereof, restricting the terms upon which the article may be used and the price to be demanded therefor. * * * The owner of a patented article can, of course, charge such price as he may choose, and the owner of a patent may assign it or sell the right to manufacture and sell the article patented upon the condition that the assignee shall charge a certain amount for such article. It is also objected that the agreement of the defendant not to manufacture or sell any other float spring tooth harrow, etc., than those which it had made under its patents before assigning them to the plaintiff, or which it was licensed to manufacture and make under the terms of the license, except such other style and construction as it may be licensed to manufacture and sell by the plaintiff, is void under the act of Congress. The plain purpose of the provision was to prevent the defendant from infringing upon the rights of others under other patents, and it had no purpose to stifle competition in the harrow business more than the patent provided for, nor was its purpose to prevent the licensee from attempting to make any improvement in harrows. It was a reasonable prohibition for the defendant, who would thus be excluded from making such harrows as were made by others who were engaged in manufacturing and selling other machines under other patents. It would be unreasonable to so construe the provision as to prevent defendant from using any letters patent legally obtained by it and not infringing patents owned by others. This was neither its purpose nor its meaning."

We think the principles announced in that case must control our decision of the question which is here presented, and under its authority we hold that the contract in question in the present case is not void as against public policy, as tending to create a monopoly, or as obnoxious to the provisions of the Sherman anti-trust act.

The principles announced in the case just cited are applicable also to the question whether the contract was prohibited by section 1673

of the Code of Civil Procedure of California. That section reads as follows:

"Every contract by which one is restrained from exercising a lawful profession, trade, or business of any kind otherwise than as provided by the next two sections, is to that extent void."

The next two sections referred to have no relevancy to the questions involved in the present case, and need not be quoted. That the provisions of a state law cannot affect rights acquired under a patent of the United States, is too plain to require discussion. In Columbia Wire Co. v. Freeman Wire Co. (C. C.) 71 Fed. 302, 306, the court said:

"The entire theory and purpose of our patent laws is to create a limited monopoly. In consideration that a patentee will give his invention to the public, with full drawings and specifications, so as to enable the public to freely use it at the expiration of 17 years, a grant is made to him of an exclusive right to the monopoly of the patented device during that time. The rights so acquired by the patentee under a grant from the United States are entirely inconsistent with the patentee's being made subject to the provisions of the anti-trust laws of the several states."

But, whatever may be the effect of the section of the California statute quoted as regards the contract in question, we hold that it can have no relevancy to any portion thereof except that covenant of the licensee embodied in the fourth provision of the license contract that it shall "neither sublet any of said machines, nor allow any parties, except its own employés, to have possession or control of, or to use said machines; shall not use any other raisin-seeding machines during the life of this contract than those furnished by the first party, or with their consent; and shall not buy, sell, nor deal in raisins seeded or treated by any other machines or processes than those of the first party." If that provision of the contract is, indeed, rendered void by the local statute, none of the questions presented in this case is thereby affected, as that provision is not involved in the litigation. The plaintiff in error sued on two covenants only of the license contract—the covenant to pay a royalty, and the covenant not to sublet the machines. These are valid and subsisting covenants, and are not affected by section 1673, which provides that the contract which contravenes that section is only "to that extent void." In Oregon Railway & Navigation Co. v. Winsor, 20 Wall. 64, 70, 22 L. Ed. 315, the court affirmed the doctrine "that agreements in restraint of trade, whether under seal or not, are divisible; and accordingly it has been held that, when such an agreement contains a stipulation which is capable of being construed divisibly, and one part thereof is void as being in restraint of trade, whilst the other is not, the court will give effect to the latter, and will not hold the agreement to be void altogether."

It remains to be considered whether the original contract of June 26, 1900, is void, or so tainted with inequity that a court will not enforce its provisions, for the reason that it provides for oppressive litigation against third persons. The contract itself contains in its terms no provision for oppressive litigation. It contains a covenant on the part of the plaintiff in error to "institute and defend suits based

upon or concerning the inventions and letters patent above specified, and such others as may hereafter be acquired by it under and by virtue of this agreement." The license contract contained a provision requiring the plaintiff in error to "vigorously prosecute infringers of said letters patent, so as to prevent as far as possible all unlawful interference with the business and rights of said party of the second part under and by virtue of the contract." These are proper provisions, and they are not open to criticism. The ruling of the trial court was based upon certain oral testimony adduced upon the trial. There was no issue raised by the pleadings to which such testimony was applicable. The defendant in error had, it is true, alleged in its answer "that the object of the said combination was not only the purpose aforesaid, but also for the purpose of forcing out of the seeded raisin business the individuals, companies, and corporations who did not unite with the said plaintiff and join with it in its scheme and plan." That purpose, as pleaded in the answer, was not necessarily an illegal one. The answer did not aver that the said alleged purpose was expressed in the terms of the contract of June 26, 1900, or that the contract itself provided in any way for unjust or oppressive litigation. So far from making that allegation, the defendant in error set up in its answer as one of its grounds of defense, and as a reason for rescinding the contract, that the plaintiff in error, having promised vigorous prosecution of infringers of said letters patent, failed to perform the promised service. The averment of the answer that one of the unexpressed purposes of the combination was to force out of the seeded raisin business those who did not take licenses thereunder is presumably true, when it is considered that the whole of the new art of seeding raisins by machinery was covered by the patents which were pooled in the combination. The natural result of such a combination would be to force out of business all who did not obtain licenses from the plaintiff in error, for they would necessarily be infringers. The oral evidence which prompted the action of the trial court in withdrawing the case from the jury was the testimony of the president of the defendant in error, who had been an active agent in effecting the combination, that it was the "design of the organization or the understanding," that litigation was to be instituted against those who refused to take licenses, "both for the purpose of wearing them out and because they were infringers." The same witness testified later, however, that it was the purpose to close up such third parties by bringing suit against them "for infringing of patents." There was the testimony, also, of another, who said that Williamson, the secretary of the plaintiff in error, stated to the witness that he was going to close up and wear out of business all who did not take out a license. Admitting that a contract legal in its terms and in its consideration may be rendered illegal, as against public policy, by reason of the intention of the parties thereto at the time of entering into it to so use it as thereby to commit civil injury to third persons, it may nevertheless be doubted whether the mere existence in the minds of some of the contracting parties of such a purpose—a purpose different from the main purpose, and never in fact carried into execution—is, after the contract has been acted upon and acquiesced in inter partes

for eight months, ground sufficient to justify the denial of any remedy thereon. But, however that may be, we are clearly of the opinion that if, in view of the pleadings and the law applicable thereto, the question of the existence of such an illegal purpose was properly before the court as affecting the legality of the contract, it was, under the evidence, a question of fact which should have been submitted to the jury for its decision. There was evidence before the court and jury tending to contradict the evidence that such a purpose existed. There was the testimony of three of the officers of the plaintiff in error taken upon depositions in New York upon the general issues raised by the answer, in which they deposed in substance that the contract itself embodied all of the representations made to induce its execution, and that its objects were fully expressed in its terms. There was the testimony, also, of others who were asked to take out licenses under the contract, who stated that the officers of the plaintiff in error made no representation to them that suits would be brought against others, except on account of infringement of the patents.

The judgment of the lower court is reversed, and the cause remanded for a new trial.