INDIANA MFG. CO. v. J. I. CASE THRESHING MACH. CO.

(Circuit Court, E. D. Wisconsin. August 22, 1906.)

1. PATENTS—SUIT FOR INFRINGEMENT BY VIOLATION OF CONDITIONS OF LICENSE CONTRACT—LEGALITY OF CONTRACT.

Where a bill alleges infringement of patents by the violation of the conditions of a license contract thereunder, and seeks in effect the specific enforcement of the contract, its legality is involved directly and not collaterally, and must be established before equity will grant relief.

2. MONOPOLIES—COMBINATIONS IN RESTRAINT OF TRADE—LICENSE CONTRACTS UNDER PATENTS.

Conceding that a number of patents relating to the same art may be united by purchase in the same ownership, and that the grant of combination licenses thereunder on conditions specified may be within the lawful monopoly given by the patent law, yet to be immune from the operation of Anti-Trust Law of July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200] the contract must be referable solely to the inventions under the patents, and intended to secure a monopoly in the beneficial use of specific inventions only; and where it extends beyond such purpose, and is intended to create a monopoly in the manufacture of the article to which the patents relate by securing and holding for the benefit of the parties all patents relating thereto under which such manufacture may be carried on, and not for the protection of patent righs, it may constitute a conspiracy and combination in restraint of trade in violation of the law.

3. SAME.

Complainant acquired by purchase the ownership of, or exclusive license to use, 21 United States and two Canadian patents, all relating to pneumatic straw stackers, and confederated all of the manufacturers of threshing machines in the country in a plan of uniform licenses under the combined patents with a uniform price fixed for the product and payment of a royalty to complainant for each machine until the end of the full term of any of the patents or of any which might thereafter be acquired by complainant. It thereafter acquired numerous other patents, until it held over 100 in all. The devices of such patents were not all capable of conjoint use in a single machine. None of them covered the pioneer invention of a wind stacker. A number covered noninterfering devices performing the same functions and capable of independent use by different manufacturers, and many were of no practical value, and not used by any of the licensees. Held, that the purpose and effect of such system of contracts was to create a monopoly in wind-stacker products without reference either to any specific invention or the validity of any patent; that the agreement fixing the selling price of any form of the product was not attributable to any patent in the list nor to specific invention in either of the patent devices, and was not within the protection of the patent law, and that the combination created by such contracts was in restraint of trade and illegal as in violation of Anti-Trust Law July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200] and the contracts not enforceable in equity.

In Equity. On final hearing.

W. H. H. Miller, Charles K. Offield, Charles C. Linthicum, Chester Bradford, Harold Taylor, and E. H. Bottum, for complainant.

Robert S. Taylor, Charles Quarles, I. K. Boyesen, and James H. Peirce, for defendant.

SEAMAN, Circuit Judge. The issues of law and fact in this case are complicated, and the volumes of testimony, exhibits, and

argument, are formidable, both in matter and in the various phases of the controversy. That they are difficult of solution goes without saying; and with the great interests involved and harsh defense set up, it is not singular that consummate ability is brought into the contest, with the contentions upon which the solution hinges strongly presented and combatted, and the testimony and discussion not free from acrimony.

The bill is filed to enforce the alleged rights of the complainant, under certain letters patent for improvements in straw elevators and stackers, and contracts with the defendants for manufacture and sale thereunder of "Pneumatic Straw Stackers," and the relief sought is plainly in the nature of specific performance of the contract, whatever may be the name applied to the suit. It is not alone for the recovery of the royalties promised—for which the remedies at law may be adequate—but for equitable relief, by injunction and otherwise, for the enforcement of that and other terms of the contracts referred to.

The answer is voluminous in recitals of alleged equities in favor of the defendants, setting up matter tending to three grounds of defense: (1) Invalidity of the contracts in suit, as parcel of an unlawful combination to suppress competition in trade; (2) violation of the contracts on the part of complainant, so that enforcement must be denied in equity; and (3) nonuse by the defendant of the patent inventions. In argument the bill is challenged as multifarious, and for want of equity upon various propositions, which do not call for discussion, apart from one or the other of the defenses above mentioned.

The issue upon the validity of the contracts ("A" and "B") arises at the threshold, and its solution is imperative, as it clearly appears that one or both are part of the alleged combination agreement. These contracts are set up in the bill and are in evidence, as one of the fundamental grounds for the relief sought, and unless they are valid the rule is elementary (McMullen v. Hoffman, 174 U. S. 639, 654, 19 Sup. Ct. 839, 43 L. Ed. 1117) that "no court will lend its assistance in any way towards carrying out the terms" of such contract, "nor will a court of equity enforce any alleged rights directly springing" therefrom. So, their validity must be ascertained, under the issue, as a condition precedent to any relief in equity, irrespective either of the seeming want of equity in the attitude of the defendant respecting such issue, or hardships which may be imposed upon the complainant. The contention that the complainant may rest claim for infringement upon the patents alone, without reference to the license contracts, under the rule that use of the invention contrary to the terms of license constitutes infringement, is without force, if assumed to be otherwise tenable, for the reason that bill and testimony claim the benefits of the contract, and each is wholly directed to enforcement of its terms. Indeed, the relief prayed for in every aspect requires the contract for its sanction. With the case thus predicated, the validity of the contract is directly and primarily involved, and the authorities cited and pressed for

consideration as denouncing collateral inquiry or attack (vide Harrison v. Glucose Sugar Ref. Co., 116 Fed. 304, 307, 53 C. C. A. 484, 58 L. R. A. 915, and Dennehy v. McNulta, 86 Fed. 825, 827, 30 C. C. A. 422, 41 L. R. A. 609, in this circuit, and Connolly v. Union Sewer Pipe Co., 184 U. S. 540, 545, 22 Sup. Ct. 431, 46 L. Ed. 679) are plainly inapplicable, and the test mentioned in the Wiswall Case (86 Fed. 671, 674, 30 C. C. A. 339) for marking the distinction between direct and collateral attack, lends no support to the contention upon that point. Were it questionable, in any view of the subject-matter of the bill, whether it was open to such inquiry, doubt would be set at rest by these express allegations thereof; that like contracts were made with other manufacturers to the extent of embracing in the "license system" thereof "substantially all manufacturers of threshing machinery on this continent," and all pneumatic straw stackers made in the United States and Canada; that violations by the defendant—sale at less than the price fixed being one of the charges—endanger the entire system, leading "to dissatisfaction and unrest on the part of the other licensees" and encouraging like violations. Whether the system thus referred to may not be within the lawful exercise of patent privileges, is, of course, another question, dependent in each case upon the facts which enter into the arrangement, but it cannot be doubted that the contracts which make up the system are open to challenge, either for monopoly not authorized by the patent law, or for other taint. Equity is not content to enforce an agreement upon its form alone, but will search beyond its terms to ascertain the true object, when the issue of legitimacy is raised. I am satisfied that such issue is presented here, and must be determined under the evidence.

The question of the lawfulness of the monopoly created by the contracts and license system in suit is one of mixed law and fact. The substantial facts are well established, if not conceded, and the inferences of fact impress me as free from difficulty, unless it be in reference to the nature of invention in one or more of the patents, which enters into the ultimate inquiry of the effect of the combination. Laying out of view the feature of property in patents (owned or to be acquired) involved in the argument, the doctrine is settled that the monoply in trade created by the agreement violates the express terms of Act Cong. July 2, 1890, c. 647, § 3, 26 Stat. 209 [U. S. Comp. St. p. 3200], known as the "Sherman Anti-Trust Act" (as well as the common-law) so that the contract cannot be upheld, unless saved from invalidity by the element of patent license referred to. Bement v. National Harrow Co., 186 U. S. 70, 92, 22 Sup. Ct. 747, 46 L. Ed. 1058; Northern Securities Co. v. United States, 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679. On the other hand, the grant of a patent creates a lawful monopoly, for the term of the grant, in use of the invention, and the right of the owner (patentee or assignee) is well recognized, to parcel out, restrict, or withhold such use, at will; and he may fix the price at which the patented article or product shall be marketed. With the aggregation of patents embraced in this combination agreement, how-

ever, the question of the applicability in all phases of the one and the other of the above-mentioned rules is not, as I believe, settled by the authorities. The decisions are not harmonious in cases which seem to be analogous in certain features, so that the question, broadly stated, remains at large, to be determined upon general principles which are settled, both in reference to the public policy of the laws respectively which restrain general monopolies, and those which confer a limited monopoly for inventions and literary productions, and in the light of the leading opinions cited. Nor can the conclusions yield to the influence (suggested in argument) of the grave interests which may be effected upon the one side, or of privity or alleged misconduct or inconsistent acts of the other party.

The primary contract ("A") grants license to the manufacturers under 21 United States patents expressly named, and two Canadian patents, "relating to the art or method of taking straw and dust from threshing machines," which the licensor "controls by ownership or exclusive license," and extends "until the full end of the term of any such patent" owned by it, or of the license under patents which are thus controlled, together with "any inventions which may be hereafter acquired" by the licensor. The terms to be observed do not require specification for the present purpose, except that the royalty to be paid is $30 on each stacker made "embodying any of said inventions or improvements," and "the selling price to users of machines" thereunder must be $250, when sold on time, or $235 for cash sales, with agency commissions limited to $25; and the licensee is not to dispute the patents "directly or indirectly" nor "make their alleged invalidity a defense" in any manner. This agreement was executed between the present parties April 8, 1895. On January 20, 1899, they made a supplemental agreement ("B") in compromise of differences, which I deem immaterial for the present consideration, unless it be in the provision that the licensee "will not, either directly or indirectly, raise any question as to the validity of the contract ("A") which it reaffirms.

This license agreement, upon its face, does not depart, as I assume, from the customary forms of a license system, except in the great number of patents included, and, perhaps, the extent or indefiniteness of the term which may be implied from the recitals. The testimony is voluminous in reference to numerous additional patents which have been acquired by the complainant, from licensees and others, in the development of its system, so that its so-called "patent properties exceed 100 in number," although five only are alleged in the bill to be invaded by the defendant's structure. While I have deemed it unnecessary to examine this array of patents, in detail, except the five referred to—not even to ascertain their relation respectively, remote, or otherwise, to the wind stacker art—these general facts are either conceded or undisputed. Many of the patents named in the contract and subsequently acquired are of no substantial value; many are neither used nor applicable for practical use by any of the licensees in the system; some are used only by single licensees; and, however the fact may be in reference to the five alleged to be infringed, the

patent devices combined under the terms of the license are not, "in whole or in part, capable of conjoint use in a single machine." On reference to the subject-matter of these patents, it is obvious upon their face that all are not of such relation and character that each is needful, in any sense, to protect the just monopoly granted to any patentee in the list, as pioneer or subordinate invention, although a portion may be so related and useful to one another, when associated under the license. Moreover, the fact is not only presumptive from the grants, but appears on the face of the patents respectively—whatever view is adopted of the legitimate scope of invention in the alleged pioneer pneumatic stacker—that more or less of the patents included in the license system are not in interference with either of the prior inventions disclosed in any of the patents; and that such devices are capable of independent use in an independent mechanism of the art.

Upon these premises alone—of numerous patents covering various inventions in the ownership of a single purchaser, and license issued thereunder for exclusive use of the inventions by licensees upon the terms specified—the rule is assumed (for the present consideration) to be settled that monopoly of such inventions is within the objects of the grants, and that the transactions do not, prima facie, violate the general provisions of law against combinations in restraint of trade. Bement v. National Harrow Company, 186 U. S. 70, 93, 22 Sup. Ct. 747, 46 L. Ed. 1058. Nevertheless, I am satisfied that monopoly thus secured, to be immune from the anti-trust act, must be referable solely to the inventions under the patents, and that a combination of licensees formed thereunder may create a monopoly which exceeds the legitimate scope of the patent privileges, not within the contemplation of the provisions for the grant, and thus violate the general act referred to—with or without intentional co-operation on the part of the licensor. In other words, while exercise of the right which the authorities concede to be inherent in the grant, of obtaining several patents by purchase and combining them in a license, results, in a sense, in combination of licensor and licensees to uphold monopoly of the inventions, which may be lawful, I am of opinion that such combination must be limited to the express policy and object of the patent grant—monopoly in beneficial use of a specific invention—and when extended beyond that purpose by concert of action, may thus be brought within the inhibition of the general law; that this right to assemble and hold patent properties, alike with the instance in the Northern Securities Case, may be abused; may be the means and guise for creating what has been aptly termed "a conspiracy of monopolists," so that the act which is otherwise innocent and within individual rights becomes unlawful as opposed to public policy in the methods employed; and that the transaction must be probed, under the issue beyond the license terms, to ascertain the true objects sought and obtained by this combination.

The testimony is too voluminous for recapitulation here, but the general plan and purpose of the system promoted and carried out by the complainant, upon its own showing, may be thus summarized:

Owning the alleged pioneer patents of Buchanan for pneumatic straw-stacker devices (No. 297,561, of 1884, soon to expire, and No. 467,476, of 1892), under which its predecessor corporation was operating, the use of such general pneumatic means in the threshing machine art was deemed of great value. Means along the same line were soon devised by other inventors—notably the patents expressly included in this suit, Nethery's (1893) No. 493,734; Nethery's (1894) No. 517,475; Landis' (1894) No. 512,553; Landis' (1894) No. 514,-266—and were used or about to be adopted by threshing machine manufacturers. By way of dominating the art these patents were acquired by the complainant (or its predecessor), and the manufacturers of threshing machines throughout the country were confederated in a plan of concerted license under the combined patents, with a uniform price fixed for the product. Certain of the patents were taken out in Canada for extension of the system there, and all manufacturers supplying both countries with threshing machines were brought into the arrangement, which included the purchase from licensees and others of any patents, either in use or liable to "disturb the harmony" of the plan. In the course of carrying forward the system, other patents were acquired from time to time—both from subsequent licensees to bring them in and from other patentees when conflict seemed possible—all within the contemplation of the uniform license which was expressly designed to preserve to the licensor the bulk royalty named in the license, and as well to preserve among the manufacturers unity in the selling price of all machines made under either of the patent devices, irrespective of validity or value of either of the purported inventions. The contract "A" in suit is one of the series uniting the threshing machine manufacturers—for other kindred manufacturers were ultimately included as joint licensees—and each licensee entered the system with full understanding of and concurrence in the design. The complainant was, therefore, the promoter of a two-fold combination of numerous patent properties and of all manufacturers of threshing machines, whereby great interests were affected—unquestionably within the language (if not the scope) of the anti-trust act, as "in restraint of trade or commerce among the several states, or with foreign nations" (section 1 [U. S. Comp. St. 1901, p. 3200]), or "to monopolize any part of the trade" thereof (section 2 [U. S. Comp. St. 1901, p. 3200]).

Indeed, the design as above recited is expressly referred to in one of the briefs of the complainant, in various forms, by way of indicating equities in favor of the relief sought by the bill, of which the following citations are examples:

(a) In one paragraph the complainant is thus extolled:

"Not only is it the owner of a vast number of letters patent identified in this record relating to all phases and conditions of the wind-stacker industry, but it also stands before this court as the practical creator of that industry, and without whose faith in such industry, and the patents represented thereby, such industry would not to-day exist, or if existing, would have existed in the shape of discordant factions, contests in the courts, injunctional proceedings against manufacturers and users, as widely variant as they are patentees of a hundred patents."

(b) In black-faced type, the benefits of the contract are thus stated:

"The royalty of $30 per wind stacker to complainant; the profit of $100 per wind stacker to defendants; and the price of $250 per wind stacker to the ultimate purchaser or user or farmer were entirely 'satisfactory' to all."

(c) The testimony is mentioned as convincing:

"That these defendants have received from this complainant a protection representing a large money consideration over and above the royalty fee of $30"; and, "that the complainant went widely beyond any duties imposed upon it by the terms of the license, and that to prevent any possible claim against any of complainant's licensees for infringement of letters patent, and to protect each licensee in the undisturbed conduct of its business of the manufacture of 'wind stackers,' complainant has simply paid out vast sums of money in the purchase of letters patent, the existence of which in the hands of third or hostile parties might be used either as weapons of direct assault against complainant's respective licensees, by possible suits for infringement, or might be used in particular localities to destroy the business of particular licensees by reason of an attempt to manufacture wind stackers in destruction of an established trade by such licensees, respectively."

(d) And again:

"The resulting advantages of the payment of these vast sums of money, and of the purchase of these patents by complainant, all enuring alone to the benefit of the respective licensees (and to none other more than those defendants), would, in itself, as a consideration, justify the payment of a license fee or a reasonable compensation in distinguishment from the monopoly represented by the patents identified by the license right; and this fact is just as certain, and these conditions are just as operative as a protection to these defendants under their license, even if by any chance defendants could invent a wind stacker so radically different from the wind stacker of all of the patents of complainant as admittedly not to come under or infringe any claim of any such patents."

(e) So, the liberality of the contract is referred to as exempting the defendant from royalty, if its so-called Norton Stacker lay outside of any of the patents," while entitled to "have all the benefits and advantages of that license without its royalty burdens," and the further benefits are thus enumerated:

"The defendant could and would sell its wind stackers at the price of $250, because that price is the price fixed for the market by complainant's monopoly, and adhered to by every other manufacturer in the United States and Dominion of Canada, and there would be no reason why this single defendant, as an exception, should sell at a less price. Complainant's license contract and their more than 100 patents would be equally as valuable to defendant as to the other licensees, because such patents are a barricade and protection from any other manufacturer entering the field of industry, the practical result being that the defendant would take his $100 profits upon each wind stacker manufactured and sold, and this solely by reason of the fact of complainant's patents and the binding license obligations upon all other wind-stacker manufacturers of the country."

(f) The further consideration for the agreement is urged, that the complainant was to withdraw from the field as manufacturers, and thus free the licensees from such competition.

These propositions, therefore, impress me as clearly established by the evidence: That monopoly in the general so-called "wind-stacker" products was both intended and accomplished without reference either to any specific invention or the validity of any patent and not referable alone to any patent or group of patents; that the several

patents purporting to cover that field, which were purchased by the complainant, were potent if not essential means to the end thus sought, and the other patents which were acquired from time to time were at least helpful; that concurrence of the manufacturers, in unity of action, to prevent competition in "wind stackers" of any form, was alike potent and plainly essential to carry out the plan; and that the agreement fixing the selling price for any form of the product was solely for the benefit of the manufacturers—the basis of their concurrence—and, in no sense, attributable to either patent in the list, nor to specific invention in either of the patent devices. Doubtless, the complainant's initial object was a plan for royalties from all manufacturers, with its Buchanan patents as the germ (especially the first one, with brief term to run) and acquisition of all other patents, which might be brought into competition, both by way of entrenching and perpetuating its claim, and to reach all who were engaged in the manufacture of the various forms of "wind stackers." While such plan of cumulative ownership of patents, for the purpose of obtaining royalty alone under the protection of all, is sanctioned by the authorities—notably, Bement v. National Harrow Co., 186 U. S. 70, 22 Sup. Ct. 747, 46 L. Ed. 1058—as between licensor and a licensee, I am of opinion that this combination of all manufacturers under the plan of acquisition and for the purposes above outlined, is without such sanction, so that no escape appears from the conclusion that it violates the anti-trust act, if not the common law. It is unmistakably a combination of manufacturers to restrain competition in the make and sale of their products, with merger of the patents in one ownership as a means employed for that purpose, and thus not entitled to the beneficent rule of the patent law which intends protection only of monopoly of the use of specific invention—not to foster combinations of patentees and manufacturers for general monopoly.

The complainant relies upon the line of authorities defining and upholding the rights of monopoly under patents (as I have above summarized their rule), with special reference to these recent cases as decisive: Bement v. National Harrow Co., 186 U. S. 70, 22 Sup. Ct. 747, 46 L. Ed. 1058, and United States Con. S. Raisin Co. v. Griffin & Skelly Co., 126 Fed. 364, 61 C. C. A. 334. The first-mentioned case is controlling in so far as it is applicable here, and is not without force in the one aspect of combining numerous patents in single ownership and granting license thereunder upon terms analogous to the single license set out in this bill. But the case there decided is plainly distinguished by the express terms of the opinion from the combination between the licensor and the various manufacturers above indicated. That was a hearing on error to the Supreme Court of New York (after the state Court of Appeals had reversed for want of jurisdiction to review the facts), and the only reviewable question, as stated in the opinion, was the validity of the single contract in suit, with no facts found of a combination of licensees as set up there in the answer. So, the question of the effect of such alleged combination was not reviewable under the findings, and was excluded from consideration, as the opinion carefully and repeatedly points

out; and it furnishes no support for the agreement in suit. The Raisin Co. Case, supra, if otherwise applicable, is expressly founded upon a view of the last-mentioned decision of the Supreme Court which overlooks the distinction referred to, as I understand it, and I am unable to concur in that view; and I deem it distinguishable, in any event, from the combination which appears in the case at bar.

On the other hand, the decisions in the Third Circuit, in National Harrow Company v. Hench (C. C.) 76 Fed. 667, in the Circuit Court and upon appeal, 83 Fed. 36, 27 C. C. A. 349, 39 L. R. A. 299, impress me as stating the true rule which should govern the present contract, and the conclusion of illegality in the present combination may well rest on the grounds there expressed.

I am further impressed, however, with special features, which enter into this arrangement, in reference to the patents (not appearing in any of the cases called to attention), lending force, as I believe, to the contention of unlawful monopoly. When the undertaking was started, the pneumatic straw stacker was not a mere experiment, but in practical use, as an attachment to or part of the threshing machine. Its usefulness and popularity were well recognized, in various of the patent forms. Manufacturers of threshing machines were either making them under a patent, or procuring them from a maker, to be used with the machine; and many, if not all, of such manufacturers were desirous of license, under one or another of the existing patents, to make the stacker in connection with their machine. The five patents named in the bill as infringed were then in the field—with others listed in the license, which do not call for special reference—as competitors for that trade; and it is unmistakable that this condition was a moving cause for the combination. Consideration of these patents, in the light of the prior art and in relation to each other, is of interest—and in one view essential—to show their bearing upon the plan. Upon the issue of infringement they were elaborately discussed in the oral arguments (and as well in the briefs), and I have given much time to their careful examination. For the purposes of the present point, however, it seems inadvisable to discuss in detail the claims under either, or the prior art (upon which direct issues may hereafter arise), and a summary statement of my deductions and their basis will serve for application here.

On behalf of complainant, it is contended that Buchanan's patent No. 467,476 (which it then owned) was the first successful stacker in this art—the pioneer "wind stacker"—with the four succeeding patents of Nethery and Landis (Nos. 493,734, 517,475, 512,553, and 514,266) as mere improvements, but entitled to liberal interpretation. This view of the second Buchanan patent, as dominating the art, is untenable, upon my understanding of the prior Buchanan patent No. 297,561 (of 1884) and various earlier patents and publications in evidence; and the Nethery and Landis patents impress me as departures from any patentable novelty in No. 467,476 of Buchanan—not in conflict or dominated by it—but alike with its improvements upon No. 297,561 and other prior devices. The first Buchanan patent of 1884 may fairly be assumed as the pioneer in this country of the present form of pneumatic straw stacker, although all its general features

are anticipated in the British patent of Brinsmead (1868) and other early foreign devices shown in patents and publications. His second patent (in suit) is unmistakably of the same general form, with improvement in stacking function through means for vertical movement of the trunk and other details; so Netherly and Landis have improved with other specific means, but neither has departed from the general form and pneumatic idea disclosed in the original Buchanan patent. With the expiration of that patent, at the utmost, each of the improvers was entitled to the use of its disclosures, and I am satisfied that no invention of either improver was invaded by the other. In Buchanan's second patent the improved means was adapted from the old art—a mere development of the primary conception, when called for in practical use, to accommodate the stacking—of undoubted value, but not entitled to functional dominition.

As noninterfering patents of conceded utility each was open to independent use by manufacturers under license from the patentee, and it must be inferred that the pooling of the patents and enlistment of all manufacturers in a pool contract was mutually entered into in that view, and with special reference, on the part of complainant, to the early expiration of the first Buchanan patent. The royalty value of each rested upon the practical value of the improvement and the market was at hand, equally open to each, before the combination; each appears to have meritorious features to give it standing in that market. Thus all of the patents above specified—and others, as well, included in the arrangement—were in the attitude of competitors with each other for use under royalty, by the manufacturers, while the manufacturers were in competition with each other, both for bargaining to obtain license and in sale of their products. The patentees were among themselves, therefore, in that sense, equally with the manufacturers, rivals in trade for royalty use—presumptively so as to all in the same line of use, and as matter of fact in reference to those above mentioned—and thus, as I believe, within the letter and policy of the law which prohibits combinations between such "possible rivals in trade." Northern Securities Co. v. United States, 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679; Swift & Co. v. United States, 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518; Carroll v. Greenwich Ins. Co., 199 U. S. 401, 409, 26 Sup. Ct. 66, 50 L. Ed. 246. The settled rule in reference to the privileges vested in patent property is not overlooked in this view. As tersely stated in the opinion by Judge Baker, speaking for the Circuit Court of Appeals, in Victor Talking Machine v. The Fair, 123 Fed. 424, 426, 61 C. C. A. 58, 60, "without applying to the Patent Office, one may make and use and sell the device that embodies his invention. That is his natural right. Within his domain, the patentee is czar. The people must take the invention on the terms he dictates, or let it alone for 17 years. Cries of restraint of trade and impairment of the freedom of sales are unavailing, because for the promotion of the useful arts the Constitution and statutes authorize this very monopoly."

Nor do I overlook the recognized right (as before mentioned) of the patent owner, as such czar "within his domain," either to suppress his own or prescribe the terms of its use by others; or to own

and enforce monopoly under several patents. Nevertheless, as I conceive the rule, without the domain of monopoly for each individual invention, the owner stands on an equality with all other property owners and is equally amenable to the general law against confederation with others, tending to create another kind of monopoly, through concerted action of the confederates.

The patent privilege is granted by the government by excluding others from its use, unless licensed by the patentee as owner; and this exclusive use is strictly enforced by the courts; and if properly termed a monopoly—a definition not accepted by all the authorities —it is readily distinguishable from that of the common law. For enforcement it requires neither the aid of other patent privileges, nor concurrence of third parties; nor can combination with other patents lend support for its judicial enforcement. The right of the owner to purchase and enjoy other patent privileges by way of investment or increase of royalties, together with all other recognized property rights therein, except the exclusive use of each invention conferred by the grants, are held alike with the rights common to other property owners to make them profitable. So, the nature of the patent privilege confers no immunity to combine with other patentees or under other patents in a confederation of users, when such combination is prohibited generally, as in the terms of the anti-trust act. While purchase alone of the outstanding patents, interfering or noninterfering, by the complainant, might be within its rights, the combination which was entered into, with that as one of its means, as I believe, violated the law. The arrangement was not within the rule, which is of general application, that differences may be composed and litigation settled between the parties by bona fide compromises. Nor was the foreclosure which it contemplated, of all questions as to the validity or value of any patent brought into the combination, justifiable under the circumstances; and I am of opinion it was opposed to public policy.

With the contracts thus viewed, neither is enforceable in equity, and the bill must be dismissed.

Decree will be entered accordingly, but final orders respecting the funds in court will be reserved until the parties can be heard on application for appeal and stay, if so advised.