WESTINGHOUSE ELECTRIC & MFG. CO. v. MUTUAL LIFE INS. CO. OF NEW YORK et al.

(Circuit Court, W. D. New York.   February 9, 1904.)

No. 188.

1. PATENTS—ANTICIPATION—INFRINGEMENT—ELECTRIC MOTORS.

The Tesla patents, Nos. 511,559 and 511,560, the former covering a method, and the latter certain apparatus or means of operating electric motors by means of alternating currents from a single original source known as the "split-phase" system, *held* not anticipated by the publication in Milan of a lecture by Prof. Galileo Farraris April 22, 1888, on evidence which clearly and satisfactorily carries the invention back to September, 1887.   Such patents also *held* valid, and both claims of the former and claims 1 and 2 of the latter infringed by the Gutmann recording watt meter.

2. SAME—SUIT FOR INFRINGEMENT—PARTIES.

An agent is not properly joined with his principal as a defendant in a suit for infringement because of acts done in his capacity as such agent, in the absence of special circumstances.

3. SAME—DEFENSES.

It is not a defense to a suit for infringement against a user that a decree has previously been obtained against the maker, from whom the defendant bought the infringing article.

In Equity.   Suit for infringement of letters patent Nos. 511,559 and 511,560, relating to electric motors, granted to Nikola Tesla December 26, 1893.   On final hearing.

Kerr, Page & Cooper, for complainant.

Martin Carey and Seward Davis (Charles A. Brown, of counsel), for defendants.

HAZEL, District Judge.   This suit in equity is brought to establish infringement by the defendants of two United States letters patent granted to Nikola Tesla, of which complainant is the owner by assignment.   The applications for both patents were filed December 8, 1888, but, on account of interference proceedings in the Patent Office, they were not granted until December 26, 1893.   Their numbers are 511,-559 and 511,560, respectively.   The infringements consist in the use by the defendants of an alternating split-phase motor in an instrument for measuring the amount of electric energy supplied to a consumer.   The instrument containing the motor is technically known as a "recording watt meter."   The infringing apparatus used by the defendants in a building at Elmira, N. Y., is the Gutmann meter.   The defense is want of patentability, noninfringement, and anticipation.   Patent No. 511,559 has two claims, both of which are said to be infringed.   They read as follows:

"(1) The method of operating motors having independent energizing circuits, as herein set forth, which consists in passing alternating currents through both

¶ 2. See Patents, vol. 38, Cent. Dig. §§ 459, 471.

of the said circuits, and retarding the phases of the current in one circuit to a greater or less extent than in the other.

"(2) The method of operating motors having independent energizing circuits, as herein set forth, which consists in directing an alternating current from a single source through both circuits of the motor, and varying or modifying the relative resistance or self-induction of the motor circuits, and thereby producing in the currents differences of phase, as set forth."

The first claim relates broadly to the method and extent of retardation of the phase of the current. The second claim refers specifically to the method of accomplishing in the electric currents a difference of phase. Infringement is also charged of claims 1 and 2 of the patent No. 511,560, which read as follows:

"(1) The combination, with a source of alternating currents and a circuit from the same, of a motor having independent energizing circuits connected with the said circuit, and means for rendering the magnetic effects due to said energizing circuits of different phase, and an armature within the influence of said energizing circuits.

"(2) The combination, with a source of alternating currents and a circuit from the same of a motor having independent energizing circuits connected in derivation or multiple arc with the said circuit, the motor or energizing circuits being of different electrical character, whereby the alternating currents therein will have a difference of phase, as set forth."

These claims with particularity refer to an apparatus for effecting the object of process patent No. 511,559, and specifying the devices constituting the split-phase motor with a single line or circuit. It is practically conceded that infringement of either of the claims involves the complete use of the entire system described in the specifications. The patents in suit are improvements on a series of five earlier patents which are the basic inventions for a class of motors called the polyphase motors for power transmission, or rotating field alternating motors. They are operated by alternating currents of electricity. The improvement patents here considered relate to the split-phase motor. It is not intended to discuss the scope of these patents in detail, for the reason that the claims involved have been uniformly construed in one form or another in a variety of litigations which have followed the Tesla polyphase and the split-phase patents from the time of their issuance. The patents in suit especially have been attacked with well-directed, vigorous, and resolute pertinacity. The fundamental principles upon which a difference of phase in circuits is based have been set forth with elaborate detail in prior opinions by Circuit Courts and Circuit Courts of Appeals, notably by Judge Townsend in the case of Westinghouse v. New England Granite Co. et al. (C. C.) 103 Fed. 951, which was a suit upon the broad Tesla patents of May 1, 1888, Nos. 381,968, 382,279, and 382,280; by Judge Shipman in the same case for the Circuit Court of Appeals, 110 Fed. 753, 49 C. C. A. 151; by Judge Brown in Westinghouse Co. v. Royal Weaving Co. (C. C.) 115 Fed. 733; by Judge McPherson in Tesla Electric Co. v. Scott & Janney et al. (C. C.) 97 Fed. 558; by Judge Thompson in Westinghouse Co. v. Dayton Fan & Motor Co. (C. C.) 106 Fed. 724, and in the same case by Judge Severens, who wrote the opinion for the Circuit Court of Appeals for the Sixth Circuit, 118 Fed. 562, 55 C. C. A.

390; by Judge Lacombe in Westinghouse Co. v. The Catskill Illuminating Co. (C. C.) 110 Fed. 377, and in the same case by Judge Townsend for the Circuit Court of Appeals, reversing the decision of the Circuit Court, 121 Fed. 831, 58 C. C. A. 167; and recently by Judge Colt in Westinghouse Co. v. Stanley Electric Co., and by Judge Archbald in Westinghouse Co. v. Hiram C. Roberts (C. C.) 125 Fed. 6.   It would, indeed, be a work of supererogation to here attempt an analysis of the involved claims and their scope, specially in view of the extremely technical character of the abstruse questions involved, and their previous exhaustive and comprehensive consideration by the courts. In the Catskill case the Circuit Court, considering the Tesla patents in suit and the defenses there raised, sustained their validity, and unqualifiedly concurred in the decisions of Tesla Electric Co. v. Scott & Janney et al. and Westinghouse Co. v. Dayton Fan & Motor Co., supra.   The Circuit Court of Appeals, however, reversed the decision upon the ground that the publication of a magazine article on April 22, 1888, by Prof. Galileo Ferraris, fully described and disclosed the system covered by the patents in suit.   This publication upon the evidence in that case was found to be prior to the date of the inventions in suit, and constituted an anticipation.   It is quite apparent that the Circuit Court of Appeals did not intend to disaffirm or disapprove the conclusion of the Circuit Court upon any other ground, although no other issues were expressly discussed.   By implication, at least, the novelty and validity of the patents Nos. 511,559 and 511,560, as found by the Circuit Court, were concurred in and sustained.   Upon that point the opinion of the Circuit Court of Appeals states:

"By the method and means therein described, Tesla dispensed with one of the line circuits, and was able to run the motor by means of alternating currents from a single original source.   This was accomplished, as appears from the foregoing claims, by means which retarded the phases of the current in all circuits, or so varied the relative resistance of the motor circuits as to maintain the necessary difference in phase in the currents.   Such utilization of a single original source by thus splitting a single current into two currents was an improvement of great practical value."

This construction will be adopted by this court.   The conclusions in patent cases by courts of concurrent jurisdiction, though the parties are different, are in themselves strongly persuasive of their soundness; but, when these questions have been reviewed on appeal and sustained, the doctrine of res adjudicata, provided no new evidence upon the subject is shown, has undoubted application.

I am now brought to the question of anticipation.   Are patents Nos. 511,559 and 511,560 invalid because anticipated by the admitted publication of Prof. Galileo Ferraris on April 22, 1888, in Turin, Italy? It is not controverted that this publication completely described the process and method of operating motors, as set out in the specifications and claims in suit.   The Tesla split-phase patents, as has been stated, were granted December 23, 1893, upon applications filed December 8, 1888, eight months after the Ferraris publication.   Upon careful consideration of the proofs, I have arrived at the conclusion that the actual date of the Tesla inventions is prior to this publication, and that

the patents were not void for anticipation. According to the evidence, Tesla conceived his invention in his laboratory, No. 89 Liberty street, New York City, and completed the same in the month of September, 1887. He made disclosure thereof to others during the fall of 1887, especially to Mr. Brown and Mr. Nellis, witnesses for complainant, and subsequently in the month of April, prior to the Ferraris publication, to his solicitor, Mr. Page. The defense of anticipation raises a question of much importance. Evidence in support of the claim of earlier conception than the date of the application, disclosure of the invention, and its actual reduction to practice must be received with great caution. Unless such inventions were actually made and perfected before the date of the Ferraris publication, the patents cannot be sustained. The burden is upon the complainant, under the circumstances, to establish by clear, unequivocal, and convincing proof that the anticipation has been anticipated. Westinghouse Co. v. Saranac Lake Electric Light Co. (C. C.) 108 Fed. 221; Thayer v. Hart (C. C.) 20 Fed. 693; St. Paul Plow Works v. Starling, 140 U. S. 184, 11 Sup. Ct. 803, 35 L. Ed. 404. Has the complainant complied with the rule? Tesla, to sustain an earlier date of invention than the date of the application, and as a part of the complainant's prima facie case, gives testimony tending to establish the following facts: In the autumn of 1887, assisted by Mr. Szigeti, he was engaged in his laboratory at No. 89 Liberty street, New York, in perfecting different types and sizes of alternating current motors. Complainant has been unable to locate Szigeti, which tends to explain his failure to corroborate Tesla upon this point. In July, 1888, Tesla sold his polyphase and split-phase patents to the complainant corporation, and, entering its employ, took up a temporary residence in Pittsburg, where complainant's factory was located. During his absence of one year from New York, the laboratory was moved by his assistant from Liberty street, and later, after his return to New York, again moved to South Fifth avenue, where in 1895 it was consumed by a fire which destroyed all his motors, except the "Exhibit Tesla Motor." This apparatus had been reduced to practical form, according to the evidence, in September, 1887, and was in the Patent Office at Washington at the time of the fire. It had been used as an exhibit in proceedings in interference with Ferraris, and was produced as new evidence upon the hearing of this case. It is shown to be capable of successful operation by two wires, as indicated in the specifications of patent No. 511,560. The transaction to which Tesla's narrative relates occurred fully 15 years ago. Examination and consideration of all the testimony disclosed by the record satisfies me, even after this lapse of time, of its truthfulness and its accuracy. The conclusion is not reached without some degree of hesitation, solely due, however, to the views expressed by the Circuit Court of Appeals of this Circuit, in the Catskill Case, regarding the proof there submitted upon this question. This proof constitutes a portion of the evidence here, and will be treated hereafter. The standard of proof required, where anticipation has been clearly shown, to carry the invention back to a date earlier than the application, has been abundantly supplied in the present record. Here the testimony

of Tesla, emphatically and unequivocally narrated, sufficiently supported by other witnesses, as to the specific construction of the exhibit motor and its operativeness as a split-phase derivative motor in the month of September, 1887, impels me to the conclusion that its actual invention is prior to the date of the Ferraris publication. In the case at bar, the circumstances surrounding the earlier date of invention and the subsequent facts indubitably lead to the conclusion that an earlier date of invention has been definitely fixed and established. According to Tesla, the experimental motor in evidence was one of the earliest constructed, and was operated by him almost daily in September, 1887, upon the split-phase derivation system. His description of the way in which the two circuits were connected preparatory to securing the necessary difference of phase for the operation of the motor is entitled to weight, and is fairly corroborated by the testimony of Mr. Brown, to whom, with others, the single-wire system of motor operation was disclosed and explained. Tesla testifies further that subsequently, and early in April, 1888, he disclosed the invention to his solicitor, Mr. Page, who was then engaged in preparing an application for an improvement patent upon one of Tesla's earlier inventions. This communication is corroborated by Mr. Page, who testifies that the subject of such application was thereafter fully and frequently discussed. The two-wire induction motor was regarded by them as being the most important type of motors, and accordingly was fully described in the application filed May 15, 1888, without mentioning the derivation feature. Nellis, witness for complainant, testifies to the practicability and operativeness of the Tesla exhibit motor in the years 1887 and 1888. His testimony is to be received with caution, as he was not an electrician. It appears from the proofs that the experimental motor admittedly was capable of use in various ways, either as a transformer or polyphase motor, and therefore the testimony of Nellis, aside from his observations, which would be entitled to no probative effect, ought not to be entirely disregarded. So far as such testimony shows an independent recollection of facts and details, it is entitled to weight. I am unable to perceive any sufficient reason why his narrative of what he saw at particular times should not be given credence. Certainly his opportunity for observation was enticing; the laboratory was guardedly closed to the public and open to few, and the experiments of a trained expert in the intricate subject of electricity, fascinating to a mechanic, may well have made an impression. He testifies that he furnished power at night whenever Tesla tested his apparatus. It appears that Tesla showed him the method of operating with two wires the exhibit motor, which the witness says was thus revolved and reversed. The testimony leaves an undoubted impression upon the mind that, however unskilled this witness may have been shown, he had a clear recollection that the armature was revolved and reversed by the manipulation of two wires. Such operation of the apparatus, crudely and superficially stated, was substantially the discovery described in the Tesla patents in suit. It is argued that little stress ought to be placed upon this evidence in the absence of facts showing that the experimental motor was capable of operation with-

out the use of auxiliary devices.   As already observed, standing alone
it would not be entitled to consideration, but, when considered with
the testimony of Tesla and Brown, it cannot be denied some degree
of weight.   The complainant's witness Brown, by his admission, was
financially interested in the patents of Tesla, and this fact undoubt-
edly tends to detract from the force of his testimony, but no sufficient
reason is apparent to disregard it.   He testifies substantially that the
motors of the derivative split-phase type were first made by Tesla in
his laboratory in the summer or fall of 1887, and that the exhibit
"Tesla Motor" was successfully operated many times in his presence.
He says:

"It was operated by means of an alternating current, from which were
taken two derived currents, one passing through one winding and the other
through the other.   It was operated as an induction motor, or by means of
putting external resistance in one of the derived circuits."

The witness had some skill in the practical application of electricity,
and his description of the apparatus conforms to the appearance of
the exhibit motor.   It was prior to or during September, 1887, that
Tesla communicated to him the method of effecting a retardation to
produce a difference in phase by putting an inductive resistance on
one of the two derived circuits from the main circuit.   Tesla also com-
municated to his solicitor that the rotary field motor was capable of
direct operation from a single circuit, as well as from two or more
independent circuits from the current source.   To one who had thus
recently drawn specifications covering the polyphase system of motors,
the communication that such motors were capable of successful opera-
tion from a single circuit by a method of "splitting" or "derivation,"
thereby dispensing with one of the circuits, must have been not only
interesting but surprising.   I quite agree that it was astonishing that
the disclosure by Tesla to his solicitor was not made earlier; but the
reason assigned by Mr. Tesla himself deserves more than passing at-
tention.   Upon this point he testifies that he did not wish to apply for
a patent for the later invention until the patents for his polyphase
system were granted, being apprehensive that the later would minimize
the importance of the earlier.   It appears from the evidence of Mr.
Page that, upon receiving the disclosure early in April, he became
apprehensive that the applications then filed, and for which patents
were soon to be granted, were not sufficiently specific to include the
later method.   Accordingly, he advised with his associates at home,
and later in Washington, in relation to modifying or amending the
pending claims, and in devising a future course to protect the later
invention.   The conclusion reached was that an earlier patent covered
the invention, and hence the delay in not at once filing application.
Attention is called to a written charge for services rendered by Mr.
Page, under date of April 27th, upon which stress is laid by complain-
ant, and to which Judge Archbald, in his opinion in the Roberts Case,
attached much significance.   I do not attach like emphasis to this point.
In my mind, it is quite probable that the said charge, as well as the
trip to Washington, may have related to the application of May 15th,
which, as I understand the evidence, had reference to the inductive

split-phase feature, and not to a motor "connected in derivation or multiple arc with the circuit." Irrespective, therefore, of the entry in Mr. Page's lost diary of a charge for services rendered, the result of all the evidence establishes the disclosure by Tesla, in the manner and at the time stated by him, clearly, directly, and persuasively. This conclusion is strengthened by many other facts and circumstances, disclosed by the record, tending to corroborate an earlier date for the invention. The testimony of Mr. Stanley, witness for defendant, deserves to be noted. On his direct examination he testifies that between May 15 and June 15, 1888, he had an interview with Mr. Tesla in his laboratory; that nothing was said on the subject of a two-wire motor, nor were any experiments made by Tesla in his presence. Later, when confronted with a letter addressed to George Westinghouse, written by him under date of June 24, 1888, he admitted the truth of its contents. The letter states that Tesla spoke of having run the motors by one circuit with a retarding coil in one set of circuits, and mention is made of the manner in which the result is achieved, namely, by "changing the lag in one set of circuits, and using the difference in phase between direct and indirect magnetization." True, this letter was written and the interview took place two months after the Ferraris publication, but it is a circumstance which has weight in support of complainant's contention. It certainly dissipates the argument, based upon the witness Darlington's testimony, that when Tesla was in Pittsburg he was ignorant of the derivation method. Furthermore, Tesla has satisfactorily explained his failure to disclose his invention to Prof. Anthony, while at the factory of the Mather Electric Company, whereby two currents of different phase could be derived from a single source. It appears that he was admonished by Mr. Brown and Mr. Peck, both financially associated with him, to remain silent, and later, upon the advice of counsel, he again declined to furnish information sought regarding his invention. These are all significant facts, which in my judgment supply the definiteness and certainty on the question of priority of invention which the court found absent in the Catskill Case. For these reasons, the date of the inventions in suit is carried back to September, 1887.

As to infringement. It was held by Judge Lacombe in the Catskill Case, and by Judge Archbald in the Roberts Case, cases in which the infringing devices were equivalent, that, inasmuch as the meter armature of the defendant's apparatus "rotates against the action of a permanent magnet, and turns the spindle which operates the registering device," the production of some power is necessarily involved, and accordingly it was held to be immaterial that the structures of the patent involved power transmission systems, while that of the defendant involved a meter. The defendant's apparatus in the Roberts Case being practically identical with the defendant's device in this case, the conclusion and reasoning of the court in that case upon the question of infringement will be followed here. It is contended by the defendant that the disk or armature of its apparatus is rotated as a result of the energizing out of phase currents acting in unison upon it; that the position of the disk in the defendant's apparatus is horizontal,

having two electro-magnets placed in relation thereto in such a way that the magnetism intersects the same on the same radius; that one of the magnets located near the disk's edge receives a "shunt" current—that is, a current derived from the main circuit—and the other is energized by the "series" or main current. It is further contended that the said electro-magnets are so arranged in the meter as to produce electric currents of differing phase, namely, that the construction of the shunt magnet and the coils which surround it produces a certain amount of self-induction, while, on the other hand, the function of the series magnet, which has little or none of the retarding effect mentioned, is to create a magnetic force in the plane of the disk, and by their joint action cause it to rotate. The rapidity of its rotation, according to defendant's view, is "arranged to be proportional to the flow of the current employed by the consumer, passing through the series coil, and also proportional to the electrical pressure between the mains or the flow of current through the shunt coil." This description, and the manner of operating defendant's meter, in my opinion does not differentiate the same from Tesla's primary patents, to which references are made in the patents in suit, and which describe a mode of operation depending entirely upon a rotation or "whirling field of force," in which the magnetic pole shifts from point to point about the periphery of the armature, resulting in its rotation. No evidential value is attached to the defendant's theory upon this point in view of the indisputable proof that the effect of the achievement by the defendant's meter practically consists in the utilization of the Tesla method of producing a difference of phase in the energizing circuits. In the Roberts Case the armature consisted of a hollow vertical cylinder having slanting slots, while in the case at bar the armature in the form of a horizontal disk has spiral slots, and the poles of different phase are so constructed in relation thereto, as has already been pointed out, as to deflect through the radial slots of the disk the magnetic effect produced by the poles. I concur in the analysis of this feature of the defendant's apparatus, as stated by Judge Archbald. In referring to the eddy curents formed in the armature under the field poles, he says:

"The field poles, AA, at one end, are deflected by the slots in the cylinder, so as to come under the influence of the field poles, BB, of differing phase at the other end, and that it is the resultant magnetic effect of the two that causes the rotation of the armature. That it is this resultant effect that is sought and obtained is manifest, else why the deflecting slots, the only function of which is to extend the eddy currents from one to the other? Cut this off, or dispense with one set of poles, and you have no rotation, or only a most feeble one, explainable on other principles."

The record discloses that the Tesla patents describe armatures as disks wherein field poles are presented radially to their periphery, while in the defendant's motor the poles are perpendicular to the disk. These structural differences are immaterial. Other differences have been pointed out, but it is thought that they are merely a difference in form, and not such as affect the merits of the patents in suit. The Gutmann meter without the registering attachment, is appropriately described by the following diagram prepared by complainant's expert witness Waterman:

"D represents a disk of aluminum, which serves as the armature. BB are two coils of coarse wire with short iron cores which are placed on opposite faces of the disk near its center, and C is a magnetic core carrying a fine wire coil, A, and having its poles presented to opposite faces of the disk at a point near the edge of the latter. The coarse-wire coils, B, constitute one energizing circuit, while the fine-wire coil, A, is the other energizing circuit. These two circuits form paths through which the current proceeding from an alternating current generator, G, divides, and as the path or branch including the coils, B, has but a few turns of coarse wire surrounding a small amount of iron, while the path including the coil, A, has very many turns of fine wire surrounding a large iron core, the latter path will have a very high self-induction as compared with the first, and hence the current which passes through it will be greatly delayed in phase with respect to that in the other or coarse-wire path."

It is wholly unnecessary to comment upon the inventions of Cabanellas, Dumesnil, and others relied on in anticipation, or to again construe with greater particularity the claims in suit. This has been exhaustively and comprehensively done in the later adjudications in the Circuit Courts, to which attention has been called. Furthermore, the distinguishing features described in the alleged anticipatory patents have often with great particularity been explained by the courts. It is enough that it is satisfactorily shown by the proofs that the apparatus of the defendant is constructed by a method of applying the energizing circuits in different phases, and that the effective results of the armature or disk are achieved in the defendant's motor by the mode of operation described by both claims of patent No. 511,559 and claims 1 and 2 of patent No. 511,560. Those claims, therefore, are held to be infringed.

Two other points pressed at the argument, viz., that the defendant Mandeville is not a proper party defendant, and that the meters which are the subject of this suit were sold to the defendant insurance com-

pany by the Western Electric Company, against which this complainant has already had a decree, need to be decided. The first point is sustained. The defendant Mandeville, in the absence of special cause, is not chargeable with infringement in his capacity as agent, especially as the real substantial infringer is before the court, and hence the bill as to him is dismissed with costs. The second point is overruled on the authority of Birdsell v, Shaliol, 112 U. S. 485, 5 Sup. Ct. 244, 28 L. Ed. 768; Kelley v. Ypsilanti Mfg. Co. (C. C.) 44 Fed. 19, 10 L. R. A. 686; Electric Gas-Lighting Co. v. Wollensak (C. C.) 70 Fed. 790.

It follows that the patents in suit are valid. The defendant has failed to establish any of the grounds upon which complainant's right to sue for infringement depends, and complainant is therefore entitled to a decree in the usual form, with costs and disbursements.